**NEW ENGLAND MUTUAL LIFE
INSURANCE COMPANY, INC.,
Plaintiff, Appellant,**

v.

**Mirza W. BAIG, Defendant, Appellee.**

**No. 97–2398.**

United States Court of Appeals,
First Circuit.

Feb. 4, 1999.

Joseph M. Hamilton, with whom Mirick, O'Connell, Worcester, MA, DeMallie & Lougee, LLP, were on the brief, for appellant.

Robert R. Pierce, Boston, MA, for appellee.

Before BOUDIN, LYNCH and LIPEZ, Circuit Judges.

LIPEZ, Circuit Judge.

The New England Mutual Life Insurance Company ("New England Mutual") brought this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1461 ("ERISA"), to rescind disability insurance coverage provided to Dr. Mirza W. Baig, alleging that Baig made misrepresentations on his application.[1] Baig filed counterclaims based on state law. New England Mutual moved for summary judgment on the counterclaims, arguing that all such claims were preempted by ERISA. Baig filed a cross-motion for summary judgment, arguing that his disability policy was not a "plan" to which ERISA applied, and, there being no other federal question presented, the district court consequently lacked subject matter jurisdiction. The district court agreed with Baig and dismissed the action under Fed.R.Civ.P. 12(b)(1). *See New Eng. Mut. Life Ins. Co. v. Baig*, 985 F.Supp. 11 (D.Mass.1997). We affirm.

## I.

The district court based its determination on the following undisputed facts. Baig was hired by Cardiology Associates of Fall River, P.C., in 1992. At that time he was its only full-time physician employee. Baig purchased an individual disability policy from New England Mutual. The policy issued January 3, 1994, and covered Baig until it was rescinded on March 21, 1995. Baig purchased the policy directly from New England Mutual. He was listed as the beneficiary and the policy owner. According to the terms of the policy, his coverage would not terminate if his employment with Cardiology Associates ended, but rather would continue

---

1. New England Mutual initially brought suit in the Massachusetts Superior Court. After discovery in the state court case, New England Mutual brought this action in federal district court, alleging that issues raised in the case were governed by ERISA.

so long as Baig continued to make the premium payments. Cardiology Associates' Practice Administrator made the initial inquiry with New England Mutual and forwarded an application to Baig, and later directly forwarded verification of Baig's income to New England Mutual, but otherwise the initial purchase of insurance was made without the intervention of Baig's employer. Baig paid the premiums directly. Pursuant to Baig's employment agreement, Cardiology Associates reimbursed him for the premium payments. Reimbursements were paid by Cardiology Associates only after Baig submitted his receipts; premium payments to New England Mutual were never channeled through Cardiology Associates. There was no "summary plan description" describing benefits provided to Baig. No other employees of Cardiology Associates were insured by New England Mutual. After New England Mutual rescinded Baig's coverage, Cardiology Associates purchased a group disability policy covering Baig and other employees from another insurer.

## II.

### A. Standard of Review

■ The existence of an ERISA plan is a mixed question of law and fact. *See Belanger v. Wyman–Gordon Co.,* 71 F.3d 451, 453–54 (1st Cir.1995). "[T]he district court's interpretation of the word 'plan' as used in ERISA poses a question of law subject to de novo review." *Id.* at 453. However, "the court's inquiry into the nature and the scope of the benefits actually at issue ... demands factfinding, and is to that extent reviewable only for clear error." *Id.*

### B. What constitutes a plan under ERISA?

■ New England Mutual asserts federal jurisdiction and federal preemption pursuant to ERISA on the basis of its claim that Baig's disability insurance coverage constitutes a "benefit plan" under ERISA.[2]

ERISA's statutory definition of a benefit plan states in part:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter *established or maintained by* an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... benefits in the event of sickness, accident, disability, death or unemployment, ....

29 U.S.C. § 1002(1)(A) (emphasis added). Thus, a disability insurance policy like the one at issue in this case will qualify as an "employee welfare benefit plan" and will be subject to the strictures of ERISA if it has been established or maintained by an employer. *See* 29 U.S.C. § 1003(a). In determining whether a plan is established or maintained by an employer, we must look for "the undertaking of continuing administrative and financial obligations by the employer to the behoof of employees or their beneficiaries." *Belanger,* 71 F.3d at 454.

■ We look to an employer's "continuing administrative or financial obligations" because such obligations implicate the fundamental policy concerns at the heart of the ERISA statutory scheme. These policy concerns can be grouped into two broad (and sometimes overlapping) categories: concerns for the protection of employers, and concerns for the protection of employees. As to the former, the Supreme Court has stated that "Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises ... with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). A plan therefore exists under ERISA where "periodic demands on [employer] assets ... create a need for fi-

---

2. ERISA's express preemption clause states as follows: "Except as provided in subsection (b) of this section [saving state banking, insurance and securities laws but preempting their application to plans], the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a).

nancial coordination and control" on the part of the employer. *Id.* at 12, 107 S.Ct. 2211. More recently, the Court has stated that finding a plan requires that the employer have at least "some minimal, ongoing 'administrative' scheme or practice. . . ." *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n. 2, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992), *quoted in Belanger*, 71 F.3d at 454. ERISA was also designed to provide numerous substantive protections to employees. "ERISA's substantive protections are intended to safeguard the financial integrity of employee benefit funds, to permit employee monitoring of earmarked assets, and to ensure that employer promises are kept." *Belanger*, 71 F.3d at 454 (citing *Fort Halifax*, 482 U.S. at 15, 107 S.Ct. 2211).

 Although "[t]here is no authoritative checklist that can be consulted to determine conclusively if [benefits] rise to the level of [a] plan" under ERISA, *id.* at 455, we will be inclined to find a plan where there are elements that "involve administrative activity potentially subject to employer abuse," *Fort Halifax*, 482 U.S. at 16, 107 S.Ct. 2211. A mere purchase of insurance by an employer is not sufficient to establish a plan under ERISA. *See Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990). Where insurance has been purchased by an employer, the "crucial factor in determining if a 'plan' has been established is whether the purchase of the insurance policy constituted an expressed intention by the employer to provide benefits on a regular and long term basis." *Id.* at 1083. Similarly, whether a "reasonable employee would perceive an ongoing commitment by the em-

ployer to provide employee benefits" is an important consideration. *Belanger*, 71 F.3d at 455.

### C. Was Baig's disability coverage a "plan" under ERISA?

 New England Mutual argues that an employer's reimbursement of premiums paid directly by an employee should constitute substantial evidence of the existence of an ERISA plan.[3] The policy at issue here was not initially established by a contractual arrangement between Cardiology Associates and New England Mutual; rather, Baig made the initial purchase directly. Baig paid the premiums directly to New England Mutual. The policy was an individual policy covering only Baig himself. Under these particular circumstances, the reimbursement by his employer of premiums paid directly by Baig did not create a plan under ERISA. As the district court stated:

> When an employer deals directly with the insurer and actually purchases an insurance policy for an employee, there may be sufficient participation to meet the "established or maintained" requirement under ERISA. On the other hand, an employer who simply pays its employees enough so that the employees are encouraged on their own to buy insurance policies could not be thought to have established or maintained any policy that any individual employee might purchase. Cash reimbursement after the fact presents no different case.

*Baig*, 985 F.Supp. at 14. Even where an employer actually purchases an insurance

---

3. The cases New England Mutual cites in support of this position all involve one of the following elements not present in this case: (1) a direct contractual arrangement between the insurer and the employer establishing the policy in question; (2) direct payments of premiums by the employer to the insurer, with the payments either made out of employer funds, or collected from multiple employees and jointly submitted by the employer; or (3) group coverage. *See Robinson v. Linomaz*, 58 F.3d 365, 367 (8th Cir.1995) (group policy, purchased by employer, premiums paid by employer); *Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444, 445 (4th Cir.

1993) (group policy, premiums paid by corporate employer); *Randol v. Mid–West Nat'l Life Ins. Co. of Tenn.*, 987 F.2d 1547, 1551 (11th Cir.1993) (employer wrote first check purchasing group policies, contributed in part towards premiums, and collected remainder from employees, making payments directly to insurer); *Brundage–Peterson v. Compcare Health Servs. Corp.*, 877 F.2d 509, 510–11 (7th Cir.1989) (employer contracted directly with insurers and collected and submitted payments for group coverage); *Credit Managers Ass'n of S. Cal. v. Kennesaw Life and Accident Ins. Co.*, 809 F.2d 617, 619–20, 625 (9th Cir. 1987) (group policies).

policy,[4] or makes payments directly,[5] there may not be a "plan" for ERISA purposes. In this case even these elements are absent, and nothing else about the coverage at issue implicates any of the policy concerns underlying ERISA. The administrative burdens on Cardiology Associates were nearly nonexistent, and its financial obligations were limited to after-the-fact reimbursement, such that there was little chance for abuse, carelessness or misappropriation of funds of the sort that might escape Baig's oversight or threaten his benefits.

New England Mutual also argues that Cardiology Associates evidenced its "intention ... to provide benefits on a regular and long term basis," *Wickman*, 908 F.2d at 1083, by the terms of Baig's employment agreement, which required Cardiology Associates to provide disability coverage for Baig, and by the fact that after New England Mutual rescinded Baig's policy, Cardiology Associates purchased a group disability policy covering Baig and other employees. In *Wickman* we stated that if an employer's "purchase of the insurance policy constituted an express intention by the employer to provide benefits on a regular and long term basis," such intention would be a "crucial factor" in determining the existence of a plan. *Id.* Where there is such a purchase, evidence demonstrating the express intention of an employer to provide continuing benefits is among those "factors [which] tend to be more indicative of the existence of a plan than others." *Belanger*, 71 F.3d at 455.

Here, however, the employer did not purchase the insurance. Indeed, the policy itself did not bear any relationship to Baig's employment, and would have continued in effect as long as Baig continued to pay the premiums, regardless of any changes in his employment situation. Moreover, Cardiology Associates' post-hoc actions provide, at most, only limited evidence of its intent, under *Wickman*, to cover Baig on a regular and long term basis at the time the policy with New England Mutual was purchased.[6]

We conclude based on the undisputed facts of this case that the district court correctly found that Baig's disability insurance coverage was not an "employee welfare benefit plan" governed by ERISA. Because there was no other basis claimed for federal subject matter jurisdiction, the district court properly dismissed the case.

*Affirmed.*

---

**4.** We stated in *Wickman* that an employer's "mere purchase of insurance," without more, does not constitute a plan. 908 F.2d at 1082. *See also Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir.1988) (bare purchase of insurance may be evidence of plan's existence, but does not establish plan by itself); *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 464 (10th Cir.1997) (same).

**5.** A plan is not created in certain situations where an employer makes direct payments to an insurer as an intermediary, acting as a channel for premium payments from individuals. A Department of Labor safe harbor regulation states that group insurance programs offered by an employer will not be considered a "plan" under ERISA where the employer does not make contributions to the coverage, participation in the program by employees is voluntary, and the employer does no more than (1) permit the insurer to publicize the program (without endorsing it)

and (2) "collect premiums through payroll deductions or dues checkoffs and remit them to the insurer." 29 C.F.R. § 2510.3–1(j) (1998).

**6.** The district court also noted that there was no "summary plan description" or other documentation describing the disability benefits provided to Baig. 985 F.Supp. at 12. The court correctly noted that in *Wickman* we found that the *presence* of such documentation constituted evidence that the employer intended "to provide benefits on a regular and long term basis." *Id.* at 13 n. 1 (quoting *Wickman*, 908 F.2d at 1083). Such intent is a factor in determining whether the employer "established or maintained" a plan. However, the *absence* of such documentation should not necessarily lead to a finding that there was no plan under ERISA. *See Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir.1982) (en banc) (administrative failure to produce documentation should not allow circumvention of ERISA).