James R. O'LEARY, Plaintiff,

v.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY,
Defendant.

Civil Action No. 03–40245–FDS.

United States District Court,
D. Massachusetts.

Oct. 20, 2006.

Gerard R. Laurence, Milton, Laurence & Dixon, Worcester, MA, for Plaintiff.

Joseph M. Hamilton, Kristina H. Allaire, Mirick, O'Connell, Demallie & Lougee LLP, Worcester, MA, for Defendant.

## *MEMORANDUM AND ORDER*

SAYLOR, District Judge.

This is an action concerning an employee disability policy. Plaintiff James R. O'Leary seeks to recover benefits under a disability policy issued by defendant Provident Life and Accident Insurance Company. O'Leary alleges that he became disabled on December 23, 1998, and has remained so since that time. Provident paid disability benefits for about a year and a half, but then determined that O'Leary was not totally disabled and discontinued paying benefits.

The complaint, which alleges only state law claims, was filed in the Worcester Superior Court. Defendant removed the action to federal court, contending that the case is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq ("ERISA"), and that plaintiff's state law claims are accordingly preempted. Plaintiff contends, however, that Massachusetts state law governs the action in all respects. Pursuant to an order of this Court, the parties conducted limited discovery and submitted memoranda as to whether the claims are governed by federal or state law. While neither party has formally moved for summary judgment, defendant's memorandum requests that the Court dismiss plaintiff's state law claims on the ground that they are preempted by ERISA. Because both memoranda make reference to evidence outside the pleadings, the Court will treat defendant's memorandum as a motion for

summary judgment, arising under Federal Rule of Civil Procedure 56.[1]

For the reasons stated below, summary judgment will be granted. Plaintiff, however, will be given thirty days to seek reconsideration or move for other relief.

## I. Factual Background

The facts, which are largely undisputed, are set forth in the light most favorable to the plaintiff.

### A. O'Leary's Employment

The New England Carpenters Training Fund (the "Fund") is a trust, whose Board of Trustees consists of representatives of both labor unions and employers.[2] The Fund's purpose is to train apprentice carpenters. It is a stand-alone entity with a training facility located in Millbury, Massachusetts. While the number of Fund employees has varied, it presently has an administrator, seven instructors, three secretaries, and four kitchen workers.

O'Leary was hired as the Fund's administrator in 1988. As administrator, his duties were to oversee training, develop curriculum, supervise office staff and instructors, attend various apprenticeship training committee meetings throughout the country, and administer the school. O'Leary reported directly to the Fund's Board of Trustees.

The Board of Trustees decided to hire O'Leary at a meeting held on August 25, 1988. The minutes of that meeting indicate that the Fund would provide him with health benefits, pension benefits, and a deferred compensation plan. There is no mention in the minutes of a disability policy. Subsequently, O'Leary received several documents from the fund, including: (1) a personnel policy for salaried employees; (2) a James O'Leary Employee Benefit Plan for deferred compensation; (3) a Pension Fund summary plan description; (4) an Annuity Fund summary plan description; and (5) a Health Benefits summary plan description. None of these documents make reference to a disability policy or disability insurance benefits.

### B. Disability Coverage

A few weeks after O'Leary began working for the Fund, it decided to provide him with disability insurance coverage. Apparently, a number of business agents of local unions had received disability coverage, and the Board of Trustees had decided to provide the same benefit to the Fund's administrator. It is undisputed that the decision to provide disability insurance was made by the Board of Trustees. It is further undisputed that O'Leary was the only Fund employee to receive this coverage.

Following the Board's decision to provide coverage, O'Leary applied for a disability policy with Provident. On his application, O'Leary stated that his employer would "pay for all disability coverage to be carried by [me] with no portion of the premium to be included in [my] taxable income." (Harrington Dep., Ex. 9).

The disability policy took effect at some point in 1988. The policy included a "Sala-

1. Specifically, both parties cite to the deposition of Thomas J. Harrington and the accompanying exhibits. Harrington is the current Executive Secretary/Treasurer for the New England Regional Council of Carpenters, which is one of many settlors of the New England Carpenters Training Fund. Harring-ton is also currently chairman of the Fund's Board of Trustees and has served as a trustee since 1989.

2. Prior to 1997 or 1998, the Fund was known as the Massachusetts Carpenters Training Fund.

ry Allotment Premium Payment" rider, which provides:

> In consideration of the Salary Allotment Agreement between your employer and us, we agree to accept Policy Premiums as billed to your employer.

The conditions of this rider are:

1. The policy will not continue in force beyond the time for which the premium is paid, subject to the grace period.

2. If your employer fails to pay premiums when due because of clerical error or negligence, your insurance under the policy will not be prejudiced.

3. This rider will be void if:

 a. your employment with your employer ends;

 b. the Salary Allotment Agreement is terminated; or

 c. for any reason, your employer fails to pay premiums.

4. If this rider is voided, premiums will be due and payable as required in the policy.

(Harrington Dep., Ex. 9)

O'Leary issued payments for the premium amount on Massachusetts Carpenters Training Fund checks, which he was authorized to sign. There is no dispute that the Fund paid 100% of the premium amount. The policy provided annual opportunities to increase the amount of the disability benefit. In order to accept such increases, O'Leary had to obtain the Board's approval. The Board gave its approval on a number of occasions, and at least once disapproved an increase in the benefit.

Although the Board of Trustees had discretion to terminate O'Leary's disability coverage at any time, it kept the policy in place during the entirety of his employ-ment with the Fund. O'Leary never received a summary plan description or any other such documentation in connection with the disability policy. The Fund kept a physical copy of the disability policy.

### C. *Denial of Disability Benefits*

O'Leary contends that he became disabled under the terms of the disability policy on December 23, 1998. The nature of the disability is unclear. He subsequently applied for benefits, and on April 23, 1999, Provident began making payments to him—informing him nonetheless that the company reserved the right to make a different formal determination regarding benefits after its investigation into his alleged disability. By letter dated October 11, 2000, Provident informed him of its determination that his inability to work was not due to an injury or sickness, that he therefore did not meet the policy's definition of disabled, and that it owed him no further benefits. O'Leary thereafter appealed the decision. A letter dated May 7, 2001, indicated that his appeal had been denied.

### II. *Procedural History*

Following Provident's denial of disability benefits, O'Leary filed suit in Worcester Superior Court. Count I of his four-count complaint, filed on October 10, 2003, alleges breach of contract. It is unclear what causes of action, if any, are stated in the remaining counts. He alleges that Provident acted "arbitrarily and capriciously" (Count II) and "unreasonably" (Count III) in failing to continue his disability benefits and asserting that his condition did not meet the terms of the policy. In Count IV, he alleges that "[t]he available evidence clearly indicates that [he] was and is disabled under the terms of the policy ... and he is entitled to recover benefits for

that disability under the terms and provisions of the policy."

Provident removed the case to this Court. Following a hearing on July 30, 2004, the Court ordered limited discovery as to the issue of whether ERISA governed this case and requested briefing by the parties. The parties filed memoranda on the applicability of ERISA in March 2005.

### III. *Analysis*

Summary judgment may be entered if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence must be viewed in the light most favorable to the non-moving party. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991).

There are two questions presented in this case: (1) whether the disability policy provided to O'Leary by the Fund qualifies as an employee welfare benefit plan for purposes of ERISA; and (2) if so, whether ERISA preempts O'Leary's state law claims.

### A. *ERISA Employee Welfare Benefit Plan*

▆ ERISA protects employee benefit rights in connection with any "employee benefit plan" unless the plan is specifically exempted. 29 U.S.C. § 1003(a).[3] ERISA

generally covers two types of employee benefit plans: employee welfare benefit plans and employee pension benefit plans (or plans that are both). 29 U.S.C. §§ 1002(1),1002(2), and 1002(3). Provident contends that O'Leary's disability policy qualifies as an employee welfare benefit plan.

▆ ERISA defines an "employee welfare benefit plan" as:

"any plan, fund, or program which ... is ... established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, [or] death ..."

29 U.S.C. § 1002(1). The First Circuit has adopted the so-called *Donovan* test for determining whether an ERISA employee welfare benefit plan exists. *See Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir.1990) (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1370 (11th Cir.1982)). Under the *Donovan* test, an employee welfare benefit plan has five elements: (1) a plan, fund, or program (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing

---

3. Earlier in this litigation, O'Leary argued that the disability policy qualified as a "top hat" plan, and was therefore exempted from ERISA's provisions. A "top hat" employee benefit plan is one that is unfunded and "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Cogan v. Phoenix Life Ins. Co.*, 310 F.3d 238, 242 (1st Cir.2002) (citing 29 U.S.C. § 1101(a)(1)). Provident argued that the policy was not a "top hat" plan,

as it was not deferred. O'Leary now appears to have abandoned this argument. In any event, while a "top hat" plan is exempt from certain ERISA requirements, it is not exempt from ERISA's reporting, disclosure, administration, or enforcement provisions, and any state law concerning such plans are preempted. *See, e.g., Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 515 (5th Cir.2002); *In re New Eng. Mut. Life Ins. Co. Sales Practices Litig.*, 324 F.Supp.2d 288, 310 (D.Mass.2004).

... disability ... benefits (5) to participants or their beneficiaries. *Donovan,* 688 F.2d at 1371. "The question of whether an ERISA plan exists is 'a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person.'" *Wickman,* 908 F.2d at 1082 (citation omitted).

There does not appear to be any dispute that elements three, four, and five have been met: the Fund is an employer that provided disability benefits to O'Leary, who was a participant. The issues in this case are whether the policy is a "plan" that the Fund "established or maintained." The *Donovan* court formulated the standard for determining whether a "plan" has been "established":

> In summary, a "plan, fund, or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.

*Donovan,* 688 F.2d at 1373. In applying this standard, " '[t]he [p]lan may adopt some of its essential provisions from sources outside itself,' including 'insurance policies that provide the [p]lan's funding.'" *Reber v. Provident Life & Acc. Ins. Co.,* 93 F.Supp.2d 995, 999 (S.D.Ind.2000) (quoting *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 739 (7th Cir.1986)). This standard is easily met here: a reasonable person can ascertain that disability benefits are the intended benefits; that O'Leary is the beneficiary; that the Fund is the source of the financing; and that the procedures for receiving benefits are those set forth in the disability policy. This suggests that by providing the disability coverage to O'Leary, the Fund established a "plan" for purposes of ERISA.

Plaintiff nonetheless argues that the disability policy does not qualify as an "employee welfare benefit plan" within the meaning of ERISA. In support of this argument, he asserts: (1) that the mere purchase of insurance is insufficient to establish an ERISA plan; (2) there was no ongoing administrative scheme; (3) the disability policy was not permanent and was subject to termination by the Board of Trustees at any time; (4) there was no written plan; (5) the disability coverage was only provided to O'Leary and not to any other Fund employee; (6) the policy was an individual, rather than group, policy; (7) O'Leary, rather than the Fund, applied for the benefits; and (8) the disability coverage was not part of his original hiring package. The Court will consider each of these arguments in turn.

### 1. Whether the Purchase of Insurance Was Sufficient to Establish an ERISA Plan

█ Plaintiff argues that the mere purchase of insurance by an employer is insufficient to establish an ERISA plan. It is true that because "no single act in itself necessarily constitutes the establishment" of an ERISA plan, the "purchase of insurance does not conclusively establish a plan." *Donovan,* 688 F.2d at 1373. However, this does not mean that an employer cannot establish an ERISA plan through the purchase of insurance. Indeed, such a proposition is foreclosed by the text of ERISA itself, which expressly defines an "employee welfare benefit plan" as one that is established "through the purchase of insurance or otherwise." 29 U.S.C. § 1002(1). Moreover, "[a] number of courts have held that an employer's payment of insurance premiums, standing alone, is substantial evidence of the existence of an ERISA plan." *Robinson v. Linomaz,* 58 F.3d 365, 368 (8th Cir.1995); *see also Madonia v. Blue Cross & Blue Shield of Va.,* 11 F.3d 444, 447 (4th Cir.

1993); *Randol v. Mid–West Nat'l Life Ins. Co. of Tenn.,* 987 F.2d 1547, 1551 (11th Cir.1993); *Donovan,* 688 F.2d at 1373; *Kidder v. H & B Marine, Inc.,* 932 F.2d 347, 353 (5th Cir.1991) (payment of premiums on behalf of employees is substantial evidence that a plan, fund, or program was established). Thus, an ERISA plan may be established where, as here, an employer purchases a disability insurance policy for an employee.

■ While an ERISA plan can be established through the purchase of insurance, not every insurance purchase qualifies as a plan. The First Circuit has indicated that "[t]he crucial factor in determining if a 'plan' has been established is whether the purchase of the insurance policy constituted an expressed intention by the employer to provide benefits on a regular and long term basis." *Wickman,* 908 F.2d at 1083. In making that determination, a "very important consideration is whether, in light of all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits," and "evidence that an employer committed to provide long-term or periodic benefits to its employees will often be telling." *Belanger v. Wyman–Gordon Co.,* 71 F.3d 451, 455 (1st Cir.1995).

Here, there is considerable evidence that the Fund intended to provide O'Leary with longterm benefits: (1) the Fund entered into a contractual agreement with Provident to pay the policy premiums; (2) the Fund in fact paid 100% of the policy premiums; (3) the Board of Trustees approved an increase in benefits on a number of occasions; and (4) the Board kept the coverage in place for the entirety of O'Leary's employment, which spanned ten years.

In arguing that the Fund's purchase of disability coverage for O'Leary did not constitute an ERISA plan, O'Leary relies on *New Eng. Mut. Life Ins. Co., Inc. v. Baig,* 166 F.3d 1 (1st Cir.1999). *Baig,* which held that no ERISA plan had been established, states:

> New England Mutual argues that an employer's reimbursement of premiums paid directly by an employee should constitute substantial evidence of the existence of an ERISA plan. The policy at issue here was not initially established by a contractual arrangement between Cardiology Associates and New England Mutual; rather, Baig made the initial purchase directly. Baig paid the premiums directly to New England Mutual. The policy was an individual policy covering only Baig himself. Under these particular circumstances, the reimbursement by his employer of premiums paid directly by Baig did not create a plan under ERISA.

*Baig,* 166 F.3d at 4. The present case, however, is clearly distinguishable. Here, the policy was initially established by a contractual agreement between the employer and Provident (i.e. the Salary Allotment Agreement), and the premium was directly paid by the employer out of employer funds. In fact, the Baig court explicitly distinguished between the circumstances in that case and the situation in the present litigation. *See id.* at 4 n. 3 (distinguishing cases where there was a "a direct contractual arrangement between the insurer and the employer establishing the policy in question" or where "direct payments of premiums [were made] by the employer to the insurer, with the payments ... made out of employer funds").

■ O'Leary attempts to evade this distinction by quoting the *Baig* court as stating that "[e]ven where an employer actually purchases an insurance policy, or makes payments directly, there may not be a 'plan' for ERISA purposes." *Id.* at 4–5.

He fails, however, to reference the footnote attached to this statement, which sets forth specific circumstances in which direct payments would not qualify as an ERISA plan. The footnote explains that "[a] plan is not created in certain situations where an employer makes direct payments to an insurer as an intermediary, acting as a channel for premium payments from individuals." *Id.* at 5, n. 5. The footnote further refers to a Department of Labor regulation that states a policy will not constitute a plan "where the employer does not make contributions to the coverage, participation in the program by employees is voluntary, and the employer does no more than (1) permit the insurer to publicize the program (without endorsing it) and (2) 'collect premiums through payroll deductions or dues checkoffs and remit them to the insurer.'" *Id.* (citing 29 C.F.R. § 2510.3–1(j) (1998)). These conditions simply are not met here, as the Fund (1) contributed 100% of the premium amount; (2) had a prior contractual relationship with the insurer to pay this premium amount; and (3) periodically decided whether or not to increase the benefit. The Court is therefore satisfied that the Fund's purchase of disability insurance in this case established an ERISA plan.

### 2. *Whether There Was an "Ongoing Administrative Scheme"*

Plaintiff contends the disability insurance policy in this case does not constitute an ERISA plan because it does not implicate an "ongoing administrative scheme." The requirement of an "ongoing administrative scheme" comes from the Supreme Court's opinion in *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). In *Fort Halifax,* the Court "construed the word 'plan' to connote some minimal, ongoing 'administrative' scheme or practice." *District of*

*Columbia v. Greater Wash. Bd. of Trade,* 506 U.S. 125, 130 n. 2, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992). In describing the "administrative realities of employee benefit plans," the Court stated that "[a]n employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements." *Fort Halifax,* 482 U.S. at 9, 107 S.Ct. 2211. It then held that the severance benefit at issue in that case—"a one-time, lump-sum payment triggered by a single event"—did not qualify as an employee benefit plan. *Id.* at 12, 107 S.Ct. 2211.

The disability insurance policy in this case, however, did implicate an "ongoing administrative scheme." The Fund's Board of Trustees had to consider, on an annual basis, whether to approve increases in the level of benefits. It is clear from the record that the Board did improve increases on a number of occasions, and declined to approve an increase at least once. Further, the policy imposed other obligations, such as reviewing O'Leary's claim for benefits, determining whether or not he qualified as "disabled," monitoring his condition to determine whether he remained eligible for benefits, disbursing the benefits, and considering the appeal of any denial of benefits. That the Fund delegated many of these administrative obligations to the insurer does not take the policy out of ERISA coverage. *See Brundage–Peterson v. Compcare Health Serv. Ins. Corp.,* 877 F.2d 509, 511 (7th Cir.1989) (stating that the delegation of administration of the plan to an insurance company is "in fact contemplated by the [ERISA] statute"); *Robinson,* 58 F.3d at

368 ("[T]here is no requirement that the employer play any role in the administration of the plan in order for it to be deemed an [employee welfare benefit plan] under ERISA.") (citation omitted); *Randol*, 987 F.2d at 1550–51 n. 5 ("[A] commercially purchased insurance policy under which the procedures for receiving benefits are all dictated by the insurance carrier can constitute a plan for ERISA purposes."). Because the disability coverage in this case—unlike the one-time severance payment at issue in *Fort Halifax*—involved a substantial "ongoing administrative scheme," it does not fall outside the requirements of an ERISA plan.

### 3. Whether There Was a Plan Where the Policy Was Subject to Termination at Any Time

■ Plaintiff further contends that his disability policy should not be governed by ERISA because his employer, the Fund, reserved the right to withdraw the insurance coverage at any time. This contention, however, is directly contrary to the applicable law. ERISA expressly exempts welfare benefit plans from a number of its requirements, including vesting requirements. 29 U.S.C. § 1051. Because welfare benefit plans are not vested, employers are "generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *Cf. Campbell v. BankBoston, N.A.*, 327 F.3d 1, 7 (1st Cir.2003) ("A severance plan is defined as a 'welfare benefit plan' ... [t]hus, employers may amend or eliminate a severance pay plan at any time."); *Reichelt v. Emhart Corp.*, 921 F.2d 425, 430 (2nd Cir.1990) ("[U]nder ERISA, the employer has the right at any time to amend or terminate a severance pay plan."). Accordingly, the Board of Trustee's ability to terminate O'Leary's policy

at any time does not remove the plan from the scope of ERISA.

### 4. Whether There Was a Plan in the Absence of Formal Documentation

■ Plaintiff next points to the absence of a formal, written summary plan description or other documentation describing the disability benefits as evidence that ERISA is inapplicable in this case. Again, however, his position lacks legal support. In *Donovan*, the Eleventh Circuit made clear that a written document is not a prerequisite to ERISA coverage, as "[t]here is no requirement of a formal, written plan in either ERISA's coverage section ... or its definitions section." *Donovan*, 688 F.2d at 1372. The court stated:

> Furthermore, because the policy of ERISA is to safeguard the well-being and security of working men and women and to apprise them of their rights and obligations under any employee benefit plan ... it would be incongruous for persons establishing or maintaining informal or unwritten employee benefit plans, or assuming the responsibility of safeguarding plan assets, to circumvent the Act merely because an administrator or other fiduciary failed to satisfy reporting or fiduciary standards.

*Id.* The First Circuit has similarly indicated that a written document is not required for ERISA to apply. *See Baig*, 166 F.3d at 5 n. 6 ("[T]he absence of [written] documentation should not necessarily lead to a finding that there was no plan under ERISA."); *see also Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir.1985) ("We agree with the Eleventh Circuit, however, that the existence of a written instrument is not a prerequisite to ERISA coverage."); *Diak v. Dwyer, Costello & Knox, P. C.*, 33 F.3d 809, 811 (7th Cir.1994) ("A plan need not be in writing to be covered by ERISA so long as the plan is a reality, meaning something more than a mere de-

294

cision to extend benefits."). Because a formal, written plan is not a requirement for ERISA coverage, the absence of written documentation does not alter this Court's determination that ERISA governs the present case.

### 5. Whether There Was a Plan Where Coverage Was Provided Only to One Employee

According to plaintiff, ERISA is inapplicable in this case because the disability insurance coverage was provided solely to him and no other Fund employees. He fails, however, to provide any statutory or case law to support this argument, and there is ample authority to the contrary. *See, e.g., Cvelbar v. CBI Illinois Inc.,* 106 F.3d 1368, 1376 (7th Cir.1997), *abrogated on other grounds,* ("[The court has] no difficulty in holding that it is possible for a one-person arrangement to qualify as an ERISA plan."); *Williams v. Wright,* 927 F.2d 1540, 1545 (11th Cir.1991) (plan not excluded from ERISA coverage because it only applies to a single employee); *Biggers v. Wittek Indus., Inc.,* 4 F.3d 291, 297 (4th Cir.1993) ("We are not aware of any requirement that a plan must cover more than one employee in order to be controlled by ERISA."). Furthermore, the Department of Labor has indicated that an ERISA plan can cover only a single employee. *See Cvelbar,* 106 F.3d at 1373.[4] Plaintiff's argument to the contrary is without merit.

### 6. Whether There Was a Plan Where the Policy Was for an Individual Rather than a Group

Plaintiff next argues that state law, rather than ERISA, applies because the

disability coverage provided by the Fund was an individual policy. Once again, he has cited no legal authority for this contention. Provident correctly responds that the statute expressly allows an ERISA plan to be established or maintained "through the purchase of insurance," but contains no requirement that the purchased insurance be a group, rather than individual, policy. *See* 29 U.S.C. § 1002(1). Furthermore, courts have found ERISA applicable in cases where the benefit plan was funded by individual policies. *See, e.g., Paul Revere Life Ins. Co. v. Bromberg,* 382 F.3d 33, 35 (1st Cir.2004) (plan, funded by individual disability insurance policies, governed by ERISA); *Reber,* 93 F.Supp.2d at 999 (ERISA found to govern individual disability policy issued by Provident to employee). Again, plaintiff's argument must be rejected.

### 7. Whether There Was a Plan Where the Participant Applied for the Policy

Plaintiff's memorandum on the inapplicability of ERISA emphasizes that O'Leary, not the Fund, was the applicant for the disability policy. His argument, however, is unclear. The Court assumes he is contending that he, rather than the Fund, "established" the plan. This argument, however, is unpersuasive.

First, the Salary Allotment Premium Payment rider contained in the policy suggests that the Fund had established a contractual relationship (the Salary Allotment Agreement) with the insurer prior to

---

**4.** "The Secretary [of Labor] has been charged by Congress with responsibility for interpreting and enforcing the definitional, coverage, reporting and disclosure, and fiduciary responsibility provisions of Title I of ERISA." *Cvelbar,* 106 F.3d at 1373 n. 3. The interpreta-

tion by the Department of Labor of its own regulations and the statute is entitled to substantial deference. *See Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1134–35 (1st Cir. 1995).

O'Leary's submission of an application. The decision in *Reber*, which confronted facts nearly identical to those at issue here, is instructive. *See id.* In *Reber*, the court considered whether ERISA governed a disability policy which had similarly been issued by Provident to an employee. *Id.* at 996–97. The policy at issue contained a Salary Allotment rider identical to the rider in O'Leary's policy, and the plaintiff employee had submitted her own application to Provident. *Id.* at 997. The court stated that the employer "dealt directly with Provident in establishing its plan," and that it had "established a contractual relationship with Provident (i.e., the Salary Allotment Agreement) before [the employee] did." *Id.* at 1004–6.

Second, even if the Court assumes, for the sake of argument, that O'Leary (rather than the Fund) established the disability plan, that fact would not remove the policy from ERISA's coverage. The statute defines an "employee welfare benefit plan" as one that is "established *or maintained*" by an employer. 29 U.S.C. § 1002(1) (emphasis added). It is undisputed that the Fund paid 100% of the premium amount. In addition, the Board of Trustees had the authority to terminate the policy at any time, yet kept it in place for the entirety of O'Leary's employment, and even approved increases in the benefits level on a number of occasions. Thus, even if O'Leary established the policy, it still qualifies as an ERISA plan because the Fund maintained it.

### 8. *Whether There Was a Plan Where the Disability Policy Was Not Part of the Original Hiring Package*

Finally, plaintiff notes that the disability policy was not part of his compensation package at the time that he was hired. The Board of Trustees did not make the decision to provide him with disability benefits until a few weeks after he had begun working. However, the Court is not aware of—and plaintiff has not cited to—any requirement under ERISA that a plan be established at the outset of employment.[5]

\* \* \*

In summary, this case involves a plan that was established or maintained by the Fund (an employer) for the purpose of providing disability benefits to O'Leary (a participant). The Court holds that it qualifies as an employee welfare benefit plan and that ERISA therefore governs.

### B. *ERISA Preemption*

■ Having determined that the disability policy provided to O'Leary by the Fund qualifies as an ERISA employee welfare benefit plan, the Court next turns to the question of whether plaintiff's state law claims are preempted. The ERISA statute states that it will "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ..." 29 U.S.C. § 1144(a). The Su-

---

**5.** While the timing of the disability coverage is not determinative of whether ERISA applies, it does have some relevance in this case. Specifically, it undermines Provident's additional argument that the disability benefits should be considered together with the other Fund benefits in determining the applicability of ERISA.

There is considerable doubt as to whether the benefits provided to all salaried employees and the disability insurance provided only to

O'Leary formed a single "plan, fund or program." However, the Court need not decide whether the disability benefits and other benefits constituted a single ERISA plan. Even if the other benefits provided by the Fund are disregarded, there is still substantial evidence that the employer established or maintained a disability plan. As such, the disability policy qualifies as an employee welfare benefit plan, regardless of its relationship to the other benefits.

preme Court has indicated that ERISA's preemption provisions are "deliberately expansive" and are to be construed broadly. *See, e.g., Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45–46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw,* 463 U.S. at 96–97, 103 S.Ct. 2890.

 In his complaint, O'Leary brings state claims for (1) breach of contract; (2) arbitrary and capricious conduct by Provident; (3) unreasonable conduct by Provident; and (4) a determination that he is entitled to benefits under the policy. Each of these claims is based on Provident's processing of his claim for disability benefits and his subsequent appeal. As such, these claims "relate to" an employee benefit plan within the meaning of ERISA's preemption clause. *See, e.g., Pilot Life,* 481 U.S. at 57, 107 S.Ct. 1549 (breach of contract action for disability benefits preempted); *Hampers v. W.R. Grace & Co., Inc.,* 202 F.3d 44, 54 (1st Cir.2000) (state-law contract claim preempted, since claim focused on plan benefits and would require extensive analysis of ERISA plan); *Reber,* 93 F.Supp.2d at 1010 (state breach of contract and bad faith termination of benefits claims preempted by ERISA). O'Leary's state claims are thus preempted.

\* \* \*

Based on the record before the Court, it appears that summary judgment in defendant's favor is warranted, in that the claims in the complaint are based exclusively on state law (and thus preempted). Nonetheless, because defendant did not file a motion for summary judgment, the Court will give plaintiff a window of thirty days in which to seek reconsideration or other appropriate relief in order to guard against any possible unfair prejudice.

### IV. *Conclusion*

Summary judgment for the defendant is hereby GRANTED, effective November 20, 2006, barring further order of the Court. Plaintiff shall have until November 19, 2006, to seek reconsideration or such other appropriate relief, if any, as justice may require. If no such motion has been filed within that period, summary judgment in favor of defendant will be entered and plaintiff's complaint will be dismissed.

**So Ordered.**